

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-15-00164-CV

IN THE INTEREST OF K.H., S.W.,
AND I.W., CHILDREN

----------

FROM THE 360TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 360-531494-13

----------

## MEMORANDUM OPINION[1]

----------

This is an ultra-accelerated appeal[2] from a judgment terminating the parental rights of Appellant R.M. (Father) to his two children, S.W. (Sonny) and I.W. (Irene).  We affirm the trial court's judgment.

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

## Background Facts

Sonny and Irene lived with their mother L.W. (Mother). Mother also has another child, K.H. (Kayla). In early November 2013, the Department of Family and Protective Services (DFPS or the Department) received a report that Mother had left Sonny and Kayla in a car while she took Irene into a store and stole a purse. Police pulled Mother over and found that none of the children were in child seats or were wearing seatbelts. A DFPS investigator went to Mother's home and spoke with Kayla. Kayla said that before Irene had been born, Mother would leave Kayla and Sonny in the home alone while Mother went to work. Kayla said she and Sonny were left in a closet during Mother's eleven-hour shifts. Mother had a history with DFPS for having left Kayla alone before and having left the children with different people. Kayla also told the investigator that Father would come over to Mother's apartment and that he "yelled a lot and she was scared of him." Kayla said that Father would give her soda mixed with alcohol that would make her dizzy.

DFPS was not able to interview Father in that investigation because Mother said she did not have any contact information for him and the old phone numbers in the DFPS files were not valid. The Department removed the children for neglectful supervision. At the DFPS office, Sonny appeared to be in pain, so the Department took the children to the hospital for evaluations. There, it discovered that Sonny had been constipated for "about a month." Sonny began

"throwing up feces," and the hospital staff said that he likely would have died had he continued to stay in such a state.

The Department filed its petition for termination in November 2013. In October 2014, the trial court granted the Department's motion for extension of the dismissal date, extending the dismissal date to March 24, 2015.[3] In April 2015, Mother relinquished her parental rights to all three children. A trial to the bench proceeded against Father and Kayla's alleged biological father, C.H. The trial court found that Father had knowingly placed or had knowingly allowed Sonny and Irene to remain in conditions or surroundings that endangered their physical or emotional well-being; had engaged in conduct or had knowingly placed Sonny and Irene with persons who had engaged in conduct that endangered their physical or emotional well-being; had constructively abandoned Sonny and Irene; and had failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of Sonny and Irene. The trial court further found that termination of Father's parental rights to Sonny and Irene was in the children's best interest. Father then filed this appeal.[4]

---

[3]The order states the dismissal date as March 24, 2014. The 2014 date is clearly a typographical error, and no party disputes that the dismissal date was extended to March 24, 2015.

[4]The trial court also terminated Mother's rights to her three children and C.H.'s rights to Kayla. Mother and C.H. did not appeal; thus, Kayla is not a subject of this appeal.

## Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. *See* Act of May 26, 2015, 84th Leg., R.S., ch. 1, § 1.078, sec. 161.001(b), 2015 Tex. Sess. Law Serv. 18–20 (West) (to be codified as an amendment to Tex. Fam. Code Ann. § 161.001) (hereinafter cited as Tex. Fam. Code Ann. § 161.001(b)); Tex. Fam. Code Ann. § 161.206(a) (West 2014); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *Id.* at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also*

4

*E.N.C.*, 384 S.W.3d at 802.  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001(b)(1); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

### 1.  Legal sufficiency

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven.  *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

We review all the evidence in the light most favorable to the finding and judgment.  *Id.*  We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so.  *Id.*  We disregard all evidence that a reasonable factfinder could have disbelieved.  *Id.*  We consider undisputed

5

evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

## 2. Factual sufficiency

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent's actions satisfying at least one ground listed in section 161.001(b)(1) and the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a

6

reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## Discussion

### I. Grounds for termination

In his first four issues, Father argues that the evidence is insufficient to support the trial court's endangerment findings. Father does not, however, challenge the sufficiency of the evidence supporting the trial court's findings on the other two grounds for termination, including the finding that he failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the children, who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of their removal for abuse or neglect. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O). Along with a best interest finding, a finding of only one ground alleged under section 161.001(b)(1) is sufficient to support a judgment of termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). We therefore do not reach the merits of Father's first four issues. *See* Tex. R. App. P. 47.1; *A.V.*, 113 S.W.3d at 362.

## II. Best interest

In his fifth and sixth issues, Father argues that the evidence is insufficient to support the trial court's best interest finding.

### A. Presumption and the statutory and *Holley* factors

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and

(F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a

finding. *Id.* That is, "[a] lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

## B. The evidence

### 1. The children's age and vulnerabilities

At the time of trial, Sonny was four years old and Irene was eighteen months' old. *See* Tex. Fam. Code Ann. § 263.307(b)(1). Father was unsure of Irene's birthday because, as he said, "it's not that I was watching—you know, in her care." Sonny had delayed speech problems. Haylee Long, the Department conservatorship caseworker, testified, "When he first came into care, you couldn't understand anything he said." Upon evaluation, these problems were attributed to severe neglect prior to coming into foster care and had improved with speech therapy. Sonny was on medications for the first few months after his removal for his constipation issues. At the time of trial, Long described Irene as "a very happy baby" who is "very advanced for her age."

### 2. History of abusive or assaultive conduct and substance abuse

Father "has a pattern of domestic violence." *See id.* § 263.307(b)(7), (12)(E). Long testified that the Department's main concerns regarding Father was his history of domestic violence and neglect and his lack of stability in housing and employment. *See id.* § 263.307(b)(3).

In 2008, the Department became involved with Kayla and Mother due to Kayla's failure to thrive. Ultimately, the Department removed Kayla from Mother

11

because they were living with Father at the time and "an incident" occurred between Mother and Father. *See id.* § 263.307(b)(2). Kayla was subsequently returned to Mother after Mother completed services. The Department became involved again in 2011. During that investigation, Kayla told the DFPS investigator that Father was aggressive and that she was scared of him. *See id.* § 263.307(b)(5). Kayla described feeling dizzy after Father would give her soda laced with alcohol. She also told DFPS investigators that Father would hit her with a stick or twig.

Mother had stated in a previous investigation that Father was physically violent and verbally aggressive towards her and Kayla. Mother said that Father would hit Kayla with a twig. Mother indicated to Long that Father continued to be physically abusive towards her during the case. Mother said that Father bit her in 2014, that she had bruises on her face, and that she had lost her job because she did not go to work. She also claimed that Father sexually assaulted her in March 2015.

Father was supposed to address his alcohol issues in his individual counseling. *See id.* § 263.307(b)(8). Long testified, "[Kayla] would frequently talk—she still frequently talks about how [Father] makes her uncomfortable because he drinks and his friends drinks and he doesn't like—she doesn't like to be around that. And [Mother] has also stated that he drinks a lot of alcohol."

Long testified that Father has been involved with domestic violence with his current girlfriend. Father was arrested in July 2014 for assault and bodily

12

injury, to which he pleaded guilty. He was on deferred adjudication at the time of trial.

**3. Father's willingness and ability to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision and to effect positive environmental and personal changes within a reasonable period of time**

Father began counseling in April 2014, and stopped attending in June 2014. *See id.* § 263.307(b)(10). He began attending counseling again in January 2015, four months before trial. Long testified that Father did not successfully complete his counseling. Father's second counselor, Bransha Gardener, testified that Father had quit counseling in June 2014 because he had gone to jail for domestic violence. Gardener said that Father's goal was to "achieve a level of effective parenting, to stop ineffective parenting." She said that Father did not meet that goal because "[h]e never put the kids first. He knew of the condition the children were living in prior to [DFPS] getting involved, he never stepped in to see about their well-being." Gardener said that Father was aware prior to the children being taken into care that Mother was "unstable" but that when he had the children, Mother "would harass him, so he would just give the kids back so he wouldn't have to deal with her." Gardener believed this was not appropriate parenting and that Father was not doing enough to protect the children. Gardener did not believe that more counselling sessions would rehabilitate Father because he lacked commitment.

13

Long sent Father to parenting classes at the same location as his individual counseling where they would be free of charge. At one point, Father asked for a different parenting class to accommodate his schedule and said he knew of an online class, but he never provided Long with the information she needed. Long testified that Father did not complete any parenting classes. Father testified that he had completed seven out of eight parenting classes before he was arrested and had to start over. He also said that his parenting class was scheduled at the same time as another class. He acknowledged that a year and a half was more than enough time to complete his services.

The Department gave Father a service plan and asked that he complete individual counseling, parenting classes, and a batterer's intervention and prevention program; maintain stable housing and employment; and attend visitation with his children. *See id.* § 263.307(b)(11). Long testified that Father was not compliant with the service plan and that he had achieved none of the goals set for him. Specifically, she said that Father had not completed his goals of learning and applying realistic expectations for the age and developmental capabilities of the children; managing income to meet the basic needs of the family; demonstrating an acceptance of the responsibility of being a parent; demonstrating an ability to provide basic necessities such as food, clothing, shelter, medical care, and supervision for the children; and demonstrating the ability to protect the children when they were not in his care. Long testified that she believed that given more time, Father would still not reach any of the goals.

14

Father completed his batterer's intervention and prevention program the week before trial. He testified that he had learned a lot from his classes and that he had changed and had learned to communicate. However, Long testified that she did not believe that Father's issues regarding family violence and domestic abuse have been resolved and that Father had not demonstrated an attitude or behavior that his problems with violence were no longer an issue.

Father only attended seven visitations during the eighteen months that the case was pending. For the first six visits, Father ignored Irene. Long said, "[Father] did not acknowledge her presence. He didn't look at her. He didn't hold her. He didn't talk to her. Nothing." Father never sent any gifts or cards to the children. Long testified that it was important that parents attend visitation because it shows commitment to the children. Long explained that there was no bond between Father and his children due to this lack of commitment and that if he did not show commitment while under court order, there was no chance he would do so when he was not supervised. She said,

> I think it's important for children to know who their parents are and to know that they're loved and that they're valued enough for their parent to visit them. And if not visit them, at least call to check on them, to call to see how they're doing, to show some sort of interest in how their life is going.

> I think that a bond is extremely important with children for their development. They're—children who are bonded to their parents, who have a relationship with their parents do better in school and they just do better in life because they feel valued.

15

Father told the Department that he was a truck driver, but he never provided proof of employment. He also told the trial court that he did not realize how serious it was that he was not attending visitation. When asked why he stopped visiting the children, he said,

> My son asked me a question, like he wanted to know why he couldn't come with me. I didn't have no answer. 'Cause back then I didn't have a job. I had not completed the program.
>
> You know, she asked—he asked me a question which, you know, as a real father, I could have had an answer, but I didn't have an answer that day. And that really got into me to the point that I felt like, you know, I'm hurting them more visiting them like this and just leaving them. But that was the wrong thing. The wrong decision.

### 4. Father's parenting skills

Gardener described Father's parenting style as "absentee parent." *See id.* § 263.307(b)(12). She said that Father would only "step in when someone force[d] him to." She described Father as "unstable" and said, "Even when he got a job and even talking about the future, it was always someone else was going to watch the kids compared to him." The DFPS investigator testified that Father would call Kayla names like "ugly." *See id.* § 263.307(b)(12)(B).

Gardener and Long both testified that they did not believe that Father had demonstrated that he could provide a safe and healthy home for his children. *See id.* § 263.307(b)(12)(D). Father did not have stable housing until about two weeks before trial. He told DFPS that he was living with "his girlfriend or a friend or a cousin" but would not provide an address. In February 2015, he gave Long

16

an address where he said he was living. Long went to the address, and the man who answered the door said that Father did not live there.

Father's name was not on the lease at his current residence. Long was concerned that Father was not on the lease because she did not "really know that he [was] living there, and he could [have left] at any time," once again demonstrating a lack of commitment. Long testified that Father was living with other people and she had not been able to do background checks on them. She said the room appeared large enough and safe for the children, but there was no furniture in Father's bedroom or in the room in which he said the children would sleep.

### 5. Father's support system

Father testified that his family had been providing him support. *See id.* § 263.307(b)(13). Father said that his cousin had helped find housing for him and the children and that he had watched Sonny when Father had to leave for work. When asked who would watch the children while Father was at work, he said that he would "strongly consider" finding another job that would give him more time at home.

Father has two older children who live in Kenya with his parents. Father told Long that "sometimes he sends money." Father believed that he is providing good parenting to his children. *See Holley*, 544 S.W.2d at 371–72.

## 6. The children's current placement

At the time of trial, the children were currently living together in a foster home, where Sonny and Irene had been since they were removed in 2013. Sonny had been in speech therapy since his removal, and Long reported that he had made "a lot of improvements."

Long asked Father for the names of any family members with whom he wanted the children placed, but he never gave Long contact information. She testified,

> [Father] originally said that he would like for his cousin in Houston to take the children. I asked numerous times for his phone number, his address, any way for me to get in contact with him. He continuously said[,] "I'll get it to you. I'll get it to you." He wouldn't even provide me with a name. He said he wanted to talk to him first.

> He later came and said that he wanted us to look at his parents, his mother and father who live in Kenya. He provided us with their information. A person in my office who actually speaks Swahili, which is what [Father]'s mother speaks, contacted her. She said that her and her husband were willing to come to the United States and care for the children, and they were just waiting on [Father] to set up an appointment with them at the embassy. To my knowledge, [Father] has not done that.

> There have been maybe one or two—there was one other relative. I believe it was a grandfather. Mr. O[.], I believe, is his name—who [Father] asked that we look into. He did not want to provide me with his information. He said that he wanted to talk to him first with [Mother] present, and that they would all talk together. I followed up several times, saying[,] "Have you done this? If not, just give me his phone number. I can contact him and talk to him." He did not do it.

18

## 7. Father's other acts and omissions

When Mother found out she was pregnant with Irene, Father gave her $500 to have an abortion. When Mother refused, Father "wanted nothing to do with the baby because he told her to have an abortion." Long also testified that Father admitted in open court that he did not want to have a relationship with Irene and that he did not want to get paternity testing. Long said that Father did not attempt to establish a relationship with Irene until August 2014, about nine months after the children were removed.

Father told the trial court that he had not visited the children because he "hated the kid," referring to Irene. He said that he had accepted Sonny as his child without a DNA test but that he was "told to do the DNA for the other kid" (again referring to Irene) because he did not believe that he was her father. He said that once he accepted that he was her father he "felt so happy."

Long testified that there was no bond between Father and the children and that the children did not indicate that they missed Father. Gardener also testified to the lack of bond between Father and the children. Sonny did not express a desire to see Father, and Long testified that Sonny "might know [Father] if he saw him, possibly." Long said, "That is concerning because there is—there is no bond there. [Father] has shown no commitment to his children—that he's willing to provide for them financially, emotionally. And if he's not willing to do that, I don't—I don't believe that they would be cared for by him."

Long testified that she was not impressed that Father had recently been making progress. She did not believe that Father could provide a safe home or that his parenting had improved, and she stated that reunification with his children would be endangering to them. The trial court asked Long for "the number one reason why [Father's rights] need[] to be terminated." Long responded,

> I believe that [Father] has had every opportunity to show his commitment to his children, that he's committed to caring for them, showing them the love that they need—not only the love, but being able to provide for them at all—and he has not even accepted responsibility for any of the domestic violence; he has not accepted responsibility for not attending visitation; he has not accepted responsibility for even being a parent to these children.
>
> THE COURT: Okay. The fact that he's contesting this, does that have any impact on your opinion?
>
> [LONG]: No.
>
> THE COURT: Why?
>
> [LONG]: Because from my conversations with [Father], I believe that this is about him winning.
>
> THE COURT: Winning what?
>
> [LONG]: Just winning this case. I don't think it really has to do with his children at all.
>
> THE COURT: Why do you know—why do you believe that? That's an interesting—you think he wants to win but it has nothing to do with his children. Help me understand what you mean.
>
> [LONG]: I believe he dislikes the children's mother very, very much, and he wants to show her that he can win.

THE COURT: Well, divorced people sometimes don't like each other. What makes this case different?

[LONG]: All I know is that in every conversation I've ever had with [Father], everything surrounds [Mother] rather than the children.

The DFPS investigator also testified that he did not believe that Father would be an appropriate placement for the children. Gardener testified that Father did not prioritize the children and that "[e]verthing came before the kids." She did not believe that Father had taken any responsibility for the children coming into DFPS's care, including denying that he had been involved with domestic violence. She did not recommend that Father be reunified with his children because she did not think that they were bonded and that Father would be a committed parent. When asked if there was "anything that was revealed during counseling that [gave her] an indication that he might have a glimmer of hope of taking responsibility and being a good parent," she answered no.

Father acknowledged that Mother had been neglectful and that she was having problems with the children, but he denied knowing that she was leaving the children alone for long periods of time. Father also denied ever physically hurting Mother. He testified that he allowed the children to remain with Mother because he thought she had changed after the last case she had with DFPS. When asked if Mother would be a problem in the future, he said, "I know she will if I get the kids." When asked if he believed he could protect them from Mother, he said, "I will make sure."

21

### C. Analysis

Father had a history of domestic violence, directed both at his partners and the children. He was on deferred adjudication community supervision for assault and bodily injury, which incident occurred during the pendency of this case. *See In re S.M.L.*, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (stating that the father's incarceration and pattern of criminal and violent conduct made it likely that he would face incarceration again in the future). Father also had problems with alcohol abuse. Father did not address any of his issues through counseling or other services, and he failed to complete his service plan. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with [a] family service plan support a finding that termination is in the best interest of the child.").

The evidence showed that Father was aware that Mother was not providing a safe and stable home for the children, but Father allowed the children to remain with her because he did not want to deal with Mother. At the time of removal, Sonny had delayed speech problems and life-threatening, long-term constipation. Father was not bonded with the children and had only attended seven visitations in over a year and a half. *See In re J.L.R.*, No. 11-05-00094-CV, 2006 WL 728069, at *2 (Tex. App.—Eastland Mar. 23, 2006, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support best interest finding when father had limited contact with child). He repeatedly referred to

22

Irene as "the kid" and had admitted in open court that he did not want to have a relationship with her.

A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.); *see also Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) ("[I]n considering the best interest of the child, evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past."). The trial court was free to believe that Father would continue in his pattern of abuse and absenteeism, especially in light of the evidence that Father had not addressed any of the Department's concerns.

Viewing all of the evidence in the light most favorable to the best-interest finding and considering the statutory and *Holley* factors, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Father and Sonny and between Father and Irene was in the children's best interest, and we therefore hold the evidence legally sufficient to support the jury's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (holding evidence legally sufficient to support finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination). Similarly, reviewing

23

all the evidence with appropriate deference to the factfinder, we hold that the jury could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Father and Sonny and between Father and Irene was in the children's best interest, and we therefore hold that the evidence is factually sufficient to support the trial court's best-interest findings.  *See* Tex. Fam. Code Ann. § 161.001(2).   We therefore overrule Father's fifth and sixth issues.

## Conclusion

Having overruled Father's fifth and sixth issues and having not reached the merits of Father's first through fourth issues, we affirm the trial court's judgment.

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

DELIVERED:  October 15, 2015